UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
IN RE:

  ELIZABETH ROTUNDA     CASE NO. 06-60054
  LAWRENCE D. ROTUNDA

        Debtors   Chapter 13
---------------------------------------------------------
APPEARANCES:

LYNN HARPER WILSON, ESQ.
Staff Attorney for Chapter 13 Trustee
250 S. Clinton Street, Suite 203
Syracuse, NY 13202

PETER A. ORVILLE, P.C.     PETER A. ORVILLE, ESQ.
Attorneys for Debtors      Of Counsel
30 Riverside Drive
Binghamton, NY 13905

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**


   Under consideration by the Court is the objection filed by Mark W. Swimelar, chapter 13

trustee ("Trustee") on March 30, 2006, with respect to the Chapter 13 Plan filed by Elizabeth and

Lawrence Rotunda (the "Debtors") on January 20, 2006.  The basis for the Trustee's objection

is his assertion that the Plan fails to provide all of the Debtors' projected disposable income to

the payment of unsecured creditors pursuant to § 1325(b)(1)(B) of the Bankruptcy Code, 11

U.S.C. §§ 101-1330 ("Code").  The Debtors filed their reply to the Trustee's objection on April

6, 2006.

   Confirmation of the Debtors' Plan was initially heard on April 11, 2006 ("Confirmation

2

Hearing") following the Court's regular motion term in Binghamton, New York, and adjourned

to May 9, 2006, to afford the Trustee an opportunity to file a memorandum of law.    The

Confirmation Hearing was adjourned to June 13, 2006, to allow the Debtors an opportunity to file

an amended plan.   An amended plan was filed by the Debtors on May 31, 2006 ("Amended

Plan"), and further arguments were heard by the Court at the June 13th motion term.    The

Confirmation Hearing was subsequently adjourned to July 18, 2006, at which time the Court

indicated that it would take the matter under submission for a decision without the need for

further memoranda of law.[1]


## JURISDICTIONAL STATEMENT


The Court has core jurisdiction over the parties and subject matter of this contested matter

pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(A), (L) and (O).


## FACTS


The Debtors filed a Chapter 13 Petition on January 20, 2006.   Accordingly, their case is

subject to the amendments to the Bankruptcy Code contained in the Bankruptcy Abuse Prevention

and Consumer Protection Act of 2005 ("BAPCPA"), made effective October 17, 2006.  As noted

---

[1] A review of the docket indicates that the Debtors filed a Memorandum of Law on April 10, 2006 (Docket No. 28), as well as a Second Supplemental Memorandum of Law on July 12, 2006 (Docket No. 34).  The Trustee filed a Memorandum of Law on May 2, 2006 (Docket No. 30) and a Supplemental Memorandum of Law on July 14, 2006 (Docket No. 35).

above, the Debtors also filed their Plan that same day, along with their Schedules and Statement of Financial Affairs, as well as other documents required under BAPCPA, including a Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income Calculation ("Form B22C").

According to Part I of FormB22C, Report of Income, Mrs. Rotunda earns $3,870.29 per month in gross wages/salary. This represents her average monthly income for the six months prior to filing their Petition.[2] In addition, she receives $1,184.20 in pension and retirement income per month. Mr. Rotunda receives $255.53 in pension and retirement income per month.[3] The total income is $5,674.02 per month, annualized at the rate of $68,088.24. The applicable median income in New York for a family of two is $48,492.00. Thus, the Debtors' income is greater than the median income for a family of two.

According to Part IV of Form B22C, Subpart A, using the deductions under the Standards of the Internal Revenue Service ("IRS"), the Debtors' total expenses are $4,533.90. In addition, in Subpart B the Debtors list $380 in "additional expense deductions" pursuant to Code § 707(b). Subpart C includes deductions for the payment of secured claims, priority claims and administrative expenses totaling $622.35. The Debtors calculate total deductions allowed under Code § 707(b)(2) to be $5,516.25. According to the calculations found in Part V, "Determination

---

[2] In the Debtors' reply, dated April 6, 2006, Debtors' indicate that Mrs. Rotunda is 68 years old and that a portion of her income from her job includes overtime pay.

[3] In Debtors' reply to the Trustee's objection, they indicate that Mr. Rotunda receives $619.53 in pension and workers compensation income, and Mrs. Rotunda receives $1,012.45 in pension income. The Court is simply pointing out what appears to be a discrepancy; however, it is not critical to the matter under discussion. In addition, Mr. Rotunda receives $1,131.00 per month in social security income and Mrs. Rotunda receives $1,191.00 per month in social security income.

4

of Disposable Income under § 1325(b)(2)," the Debtors' monthly disposable income is $157.77 ($5,674.02 - $5,516.25).  This compares to combined monthly income of $6,451.78 listed in Schedule I, which includes social security benefits, and $3,162.75 in expenses listed in Schedule J, for a monthly net income of $3,299.03.

Under the Debtors' Plan, as originally filed, they proposed to pay $800 per month over 60 months for a dividend to unsecured creditors of 10%.  Under the terms of their Amended Plan, they propose to pay $800 per month for four months, increasing the payments to $1,200 per month for the remaining 56 months, for a dividend to unsecured creditors of 25%.  According to the Debtors' counsel, the amendment was necessary to address the "best interests of creditor test" set forth in Code § 1325(a)(4).[4]

## DISCUSSION

In signing the Bankruptcy Abuse Prevention and Consumer Protection Act on April 20, 2005, President George W. Bush expressed the belief that it would restore integrity to the bankruptcy process by making the system fairer to both creditors and debtors.  He opined that "[u]nder the new law, Americans who have the ability to pay will be required to pay back at least a portion of their debts."  Press Release, White House Press Office,  President Signs Bankruptcy

---

[4]  On April 7, 2006, an objection to the Debtors' Plan was filed by Eugenia and Vasil Komar (the "Komars").  The Komars asserted that the Debtors had transferred real property to their children on July 7, 2004, reserving a life estate to themselves, for no consideration.  The Komars suggested that the Trustee investigate whether the transfer was fraudulent, asserting that the liquidation value of the property should be allocated to increase payments available to the unsecured creditors.

5

Abuse Prevention, Consumer Protection Act, at www.whitehouse.gov/news/releases.

Since the enactment of BAPCPA, there has been much criticism by both practitioners and the courts as they attempt to find their way through its "statutory maze" with little in the way of legislative history to provide them with guidance and direction. This is no more evident than in the situation now confronting this Court in the context of a chapter 13 case in which the Debtors' current monthly income ("CMI"), as defined in Code § 101(10A), exceeds the median family income for similarly situated households in their state on an annual basis.

Code § 1325(b)(1) requires that if an unsecured creditor or the chapter 13 trustee objects, the Court cannot confirm the debtor's proposed plan unless either all unsecured claims are paid in full or the plan provides that all of the debtor's projected disposable income received in the applicable commitment period is to be paid to unsecured creditors. The courts have struggled with the issue of whether "projected disposable income," as found in Code § 1325(b)(1)(B), less certain deductions, should be based on the debtor's average income for the six months prior to bankruptcy, as calculated on Form B22C, or the debtor's projected income based on their financial circumstances at the time of filing their petition, as reflected on Schedules I and J.[5]

The first court to address the issue in a published decision was the U.S. Bankruptcy Court for the Northern District of Texas in *In re Hardacre*, 338 B.R. 718 (Bankr. N.D. Tex. 2006). The court in *Hardacre* recognized that "the phrase 'projected disposable income' is subject to conflicting interpretations." *Id.* at 722. It ultimately concluded that "the term 'projected'

---

[5] The Courts to have addressed the issue in the case of debtors whose income falls below the median for their respective states have consistently held that the debtor's projected disposable income is to be calculated "the old fashion way," namely using Schedules I and J. *See, e.g., In re Dew*, 344 B..R. 655 (Bankr. N.D. Ala. 2006); *In re Kibbe*, 342 B.R. 411 (Bankr. D.N.H. 2006).

disposable income' must be based upon the debtor's anticipated income during the term of the

plan, not merely an average of her prepetition income." *Id.*  In reaching its conclusion it reasoned

that (1) in using the phrase "projected disposable income" in Code § 1325(b)(1)(B), Congress

must have intended that it mean something different from the words "disposable income" it had

defined in Code § 1325(b)(2); (2) in referring to projected disposable income that was "to be

received in the applicable commitment period," Congress intended to refer to the income actually

to be received by the debtor during that period, rather than the prepetition average used in

calculating CMI; (3) in referring to whether a debtor is committing his/her projected disposable

income "as of the effective date of the plan," Congress was, in the view of the court in *Hardacre*,

indicating that the calculation of projected disposable income be made as of that date based on

Schedules I and J, and not based on the average for the six month period prepetition.  *Id.* at 723.

In *In re Jass*, 340 B.R. 411 (Bankr. D. Utah 2006), the debtors, although above the state

median income based on calculations on Form B22C, indicated that they had experienced a

decrease in income shortly before filing due to certain medical problems which prevented Mr.

Jass from working.  The court found that the word "projected" required that it consider both

future and historical finances of the debtors in determining whether their plan complied with

Code § 1325(b)(1)(B).  It concluded that

> [t]he Court will presume that the number resulting from Form B22C is the
> debtor's 'projected disposable income' unless the debtor can show that there has
> been a substantial change in circumstances such that the numbers contained in
> Form B22C are not commensurate with a fair projection of the debtor's budget in
> the future. * * * If the Court finds adequate evidence to rebut the presumption in
> favor of Form B22C, the Court will allow the debtor to use a projected budget in
> the form of Schedule I and J to determine the debtor's "projected disposable
> income."

7

*Id.* at 418.

The court in *In re Fuller*, Case No. 06-30313, __ B.R. __, 2006 WL 2096484, (Bankr.

S.D. Ill. June 21, 2006), concluded that

> in order to determine a debtor's 'projected disposable income" for purposes of §
> 1325(b)(1)(B), the number on Form B22C does *not* end the inquiry for below - -
> or above-median debtors. Whether a debtor is above or below the median income,
> parties must determine 'projected disposable income' by looking at Schedule I to
> determine the debtor's income at the date the petition was filed. The parties should
> look to Form B22C to determine which expenses to deduct – reasonable Schedule
> J expenses for below-median debtors, standardized expenses for above-median
> debtors. But for income, parties must look to actual income at the time the debtor
> filed the petition, not the average historical income from the six months before.
> In short, parties in all cases must use Form B22C and Schedule I to calculate
> "projected disposable income."

*Id.* at *13; *see also In re Demonica*, Case No. 06-00094, 2006 WL 2136169 *8, (Bankr. N.D. Ill.

2006) (indicating that the term "projected" must mean something other than the income as

computed on Form B22C and also distinguishing between "actual monthly expenses" and

"applicable monthly expenses," the latter referring to the IRS standards).

As noted above, not all Courts agree with the conclusions in *Hardacre*, *Jass, Fuller* and

*Demonica. See, e.g. In re Guzman*, 345 B.R. 640 (Bankr. E.D. Wis., 2006)*, In re Alexander*, 344

B.R. 742 (Bankr. E.D.N.C. 2006) and *In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C. 2006).

In *Barr* the debtor proposed to pay nothing to her unsecured creditors as a result of a

negative figure of $76.46 in monthly disposable income based on the calculations on Form B22C.

According to Schedules I and J, her net disposable income was $2,038 per month. She proposed

to pay $1,525 per month into her plan to pay secured and priority creditors. The court found that

> [i]t appears that Congress intended to adopt a specific test to be rigidly applied
> rather than a standard to be applied according to the facts and circumstances of the
> case. Calculating 'disposable income' for above-median-income debtors under

new section 1325(b) is now separated from a review of Schedules I and J and no longer turns on the court's determination of what expenses are reasonably necessary for the debtor's support.

*Id.* at 185. The court acknowledged that "a debtor may be left with uncommitted income that the debtor is not required to commit to the debtor's plan under the new section 1325(b) analysis." *Id.*

The court in *Alexander* concurred that Form B22C was the tool that was to be employed in determining projected disposable income despite the fact that it might lead to results that were not aligned with the old law. *Alexander*, 344 B.R. at 747. The court in *Alexander* noted that despite the fact that chapter 13 trustees had repeatedly made their concerns known to Congress and had asked that CMI less deductions be a minimum, not the maximum, no changes were made to the legislation. *Id.,* citing Marianne B. Culhane & Michaela M. White, "*Catching Can-Pay Debtors: Is the Means Test the Only Way?*" 13 Am. Bankr. Inst. L. Rev. 665, 681 (2005). It pointed out that it is not the role of the courts to "'rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.'" *Id.* at 748 quoting *Lamie v. U.S. Trustee,* 540 U.S. 526, 542 (2004). Ultimately, the court in Alexander disagreed with the court in *Hardacre* and concluded that projected disposable income is based on historical data and "in order to arrive at 'projected disposable income,' one simply takes the calculation mandated by § 1325(b)(2) and does the math." *Id.* at 749. The court recognized that to veterans of chapter 13 practice, its conclusion may run "afoul of basic principles to suggest that a debtor with no disposable income can nonetheless propose a confirmable plan." *Id.* at 750. It noted that

because a debtor has income not counted in the definition of current monthly income, has housing or transportation expenses less than the permissible IRS deductions, has huge secured debt for luxury items that, bizarrely, may be deducted in full as a reasonable and necessary expense, or wishes to continue to contribute to or repay a loan to her 401(k) plan rather than pay her unsecured creditors, a

> debtor under the new "disposable income" test may show a zero or negative
> number, yet may be able to make the required showing that she actually has enough
> income to fund a confirmable plan.

*Id.*; *see also Guzman,* 345 B.R. at 642 (indicating that "[i]f the above-median debtor's Form B22C

contains enough deductions, the debtor will be entitled to obtain confirmation of a plan paying

nothing to the unsecured creditors, even though the debtor's budget shows that excess funds are

available").

In enacting BAPCPA, "Congress demonstrated a determination to replace judicial

discretion under general standards with precise rules-based calculations. One can understand why

bankruptcy judges would chafe at such restrictions, but that does not mean that Congress did not

mean what it said." Culhane & White, 13 Am. Bankr. Inst. L. Rev. at 682. To allow a debtor with

income above the state median to provide for zero payments to unsecured creditors in a chapter

13 plan based on the calculations on Form B22C when, according to Schedules I and J, there

remains sufficient funds to pay even a minimal dividend to them, is contrary to the approach taken

by this Court for over 20 years in considering chapter 13 plans. Yet, as noted by the court in

*Alexander,* it is not for the Court to second guess Congress despite the fact that the statute, as

written, may result in a confirmed plan that is contrary to the view expressed by President Bush

that the new law would ensure that "Americans who have the ability to pay will be required to pay

back at least a portion of their debts." (Press Release, April 20, 2005).

In this case, the Trustee takes issue with the fact that according to the Debtors' Schedules

I and J, they have a monthly net income of $3,299.03. Yet, under their Amended Plan, they

propose to pay $800 for the first four months and $1,200 for the remaining fifty-six months at a

dividend of 25%. While apparently this addresses the "best interests of creditors test" set forth in

Code § 1325(a)(4), according to the Trustee it fails to meet the requirement in Code § 1325(b)(1)(B) that all of the debtor's projected disposable income received over the five years of the plan be paid to unsecured creditors.

Under BAPCPA Congress established a starting point for determining what income was to be committed to payments to unsecured creditors under a chapter 13 plan. Instead of using a figure based on income and expenses that existed at the time a debtor completed his/her schedules and filed his/her petition, Congress opted to use an average of a debtor's income over the six months prepetition in calculating CMI, apparently with the intent to provide a more realistic picture of the debtor's financial status in first determining whether or not a debtor's income was above or below the median income of families of similar size in the state of the debtor's residence and then determining whether the applicable commitment period was to be three or five years.

CMI, which forms the basis for calculating "disposable income" as set forth in Code § 1325(b)(2), is defined as "the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the six month period" prepetition. 11 U.S.C. § 101(10A). The statute expressly excludes benefits received under the Social Security Act from CMI.

Code § 1325(b)(2) states that "disposable income" means "current monthly income received by the debtor, less amounts reasonably necessary to be expended . . . ." For purposes of the discussion herein, the statute goes on to specify that if the debtor's CMI, when multiplied by twelve, is greater than the applicable median income for a family of the same number or fewer individuals, then "amounts reasonably necessary to be expended" are to be calculated in

11

accordance with Code § 707(b)(2).  11 U.S.C. § 1325(b)(3)(B).

The Trustee suggests that the calculation of CMI is simply a starting point and once it has been established that the Debtors' disposable income was above the median and that the "applicable commitment period" is to be five years, it is then necessary to examine Schedules I and J in order to establish the amount of income projected to be available for distribution to the unsecured creditors over the five years, including any income derived from Social Security.

Despite the fact that the statute specifically excludes benefits received under the Social Security Act from the definition of CMI, the Trustee takes the position that when "projecting" disposable income, Schedule I should be taken into account and that Social Security benefits should be included in the payments the Debtors are to make to unsecured creditors.  Under the Trustee's theory, the Debtors arguably should also be required to contribute any additional monies available after deducting their actual expenses, as listed in Schedule J, in the event that they are less than the deductions based on the IRS standards applied on Form B22C.  In response, the Debtors raise the issue of how arrears on any secured debt or any priority debt are to be paid if their "projected disposable income" is based solely on the difference between the amounts on Schedules I and J since Schedule J does not include such arrears as an expense.

The Trustee argues that if one does not consider Schedules I and J to determine "projected" disposable income over the life of the plan, then Code § 1329, which allows a debtor or the trustee to seek modification of the plan post confirmation to increase or reduce the amount of payments on claims, is rendered meaningless.  The Trustee also questions the need to request that a debtor file their income tax returns postpetition on an annual basis pursuant to Code § 521(f) if CMI, which is based only on the average income received over the six months prepetition, is the critical

tool for determining projected disposable income over the life of the plan, i.e. it remains a static

amount.

The argument that Congress intended something more when it referred to "projected" in

Code § 1325(b)(1)(B) fails to address the fact that Congress defined "disposable income" after that

provision, in Code § 1325(b)(2).  The first subsection, Code § 1325(b)(1)(B) first makes reference

to "projected disposable income" and then the next subsection, specifically Code § 1325(b)(2),

goes on to explain what was being "projected," namely, CMI "received by the debtor . . . to the

extent reasonably necessary to be expended . . . ."  It is understandable that courts would attempt

to interpret the word "projected" in such a way that supports the overwhelming sense that debtors

seeking a "fresh start" must make every effort to pay their unsecured creditors as much as possible

during the "applicable commitment period."  However, to conclude that "projected" as referenced

in Code § 1325(b)(1)(B) must refer to whatever income is left after the payment of actual expenses

as set forth in Schedules I and J is no more exact than using the six month average of income in

the calculations on Form B22C.  After all, the expenses listed in Schedule J are only estimates or

"averages" as it were.  One's telephone bill is never the same from month to month; nor is one's

utility bill.  Insurance premiums may increase, as may real property taxes.  Indeed, the court is

confronted on a regular basis with debtors who have defaulted on their plan payments because of

unexpected changes in their financial situation whether it be a loss of job, divorce, medical

emergency, unanticipated repairs to ones home or car, or simply an increase in gas or home heating

costs.  The expenses listed in Schedule J and the income in Schedule I are no more accurate than

the estimates of disposable income on Form B22C.  Thus, projecting disposable income based on

an average of six months' income after certain standard deductions and payment on secured and

13

priority debt is no less realistic than the figures used in Schedules I and J for purposes of proposing

a feasible plan.

In determining whether to confirm a chapter 13 plan, it is critical to remember that a debtor

is still required to propose a plan which meets the standards of good faith, as set forth in Code §

1325(a)(3), as well as the best interest of creditors test, as set forth in Code § 1325(a)(4).  The

Court agrees with the Trustee's assertion that CMI is simply a starting point.  Code § 1323 remains

a viable option for a debtor, as does Code § 1329 for a debtor or the trustee, to modify his/her plan

should the need arise either before or after confirmation.  The Trustee has suggested that he may

start requiring the filing of yearly income tax returns by debtors.  In turn, it may be appropriate for

the Trustee to seek to modify the debtor's plan if the returns indicate an increase in their yearly

income, exclusive of Social Security benefits,  just as the debtors are entitled to modify their plan

in the event that their income decreases.[6]

In this case, the Debtors' disposable income available to pay unsecured creditors, using the

calculations set forth on Form B22C, amounts to $157.77 per month.  In their original Plan, the

Debtors proposed to pay $800 per month over a period of 60 months, including an estimated

$622.35 as calculated in Part IV, Subpart C, allocated to pay secured claims, arrears, priority

claims and administrative expenses.  Under the terms of their Amended Plan, they propose to pay

$800 per month initially for the first four months of the plan, and $1,200 per month for the

remaining fifty-six months under the terms of the Amended Plan.  The Court estimates that in

order to make the additional payments, the Debtors propose to pay approximately $400 per month

---

[6]  For purposes of this decision, the Court wishes to emphasize that the issue of how to
calculate disposable income for purposes of modifying a plan postconfirmation pursuant to Code
§ 1329 is not presently before it and need not be addressed herein.

of their otherwise exempt Social Security benefits, totaling $2,322 per month, beginning in the fifth month of the plan, apparently in an effort to comply with the "best interests of creditors test."

A similar situation arose in *In re Schanuth*, 342 BR. 601 (Bankr. W.D. Mo. 2006). In that case, the debtors' CMI placed them below the mean. The court found that their plan was not feasible because it proposed a monthly payment in excess of their disposable income as calculated by deducting their expenses as listed on Schedule J from their CMI, as reported on Form B22C, which did not include the benefits Mr. Schanuth received in Social Security disability. *Id.* at 605. While the court indicated that it could not compel the debtors to include the Social Security benefits in calculating disposable income, they certainly could voluntarily devote a portion of that income to the plan in order to overcome the feasibility problem. *Id.* at 606.

The idea that a debtor may successfully confirm a chapter 13 plan without having to make any payments to unsecured creditors, despite having what appears to be surplus income based on Schedules I and J with which to make some level of payments to unsecured creditors, understandably does not set well with the chapter 13 trustees and the courts. This same view was taken some twenty-five years ago with respect to the confirmation of chapter 13 plans that proposed to pay a dividend of one percent or less. *See, e.g. In re Bloom*, 3 B.R. 467, 472 (Bankr. C.D.Calif. 1980) (citing to several cases which supported its conclusion that a chapter 13 plan that provided a one percent dividend to unsecured creditors was illusory and not filed in good faith). *But see In re Groff*, 131 B.R. 703, 708 (Bankr. E.D. Wis. 1992) (noting that with the enactment of Code § 1325(b), Congress clarified that "the 'good faith' standard does not set any minimum amount or percentage of payments that must be made to unsecured creditors. If a debtor's plan proposes to pay all that the debtor can reasonably afford . . . then the debtor is entitled to relief

15

provided for in chapter 13 (citation omitted)").

As noted previously, with the enactment of BAPCPA, the court's discretion to review the totality of circumstances and determine the reasonableness of a debtor's expenses in calculating disposable income has been curtailed, in some instances, by the new provisions that allow, whether or not intentionally, a debtor to propose a plan which provides zero payments to unsecured creditors despite having the financial wherewithal to make some payments to them. If this was not Congress' intent, then it is up to Congress to rectify the situation. It was also Congress' decision to exclude Social Security benefits from the payment of unsecured creditors' claims even in a chapter 13 context. This is a policy decision that the Court may perhaps question but it cannot alter. That is the role of Congress. The Court concludes that the Trustee's objection, based on the fact that the Debtors in this case are not providing for the payment of the entire net income as calculated on Schedules I and J, which includes Social Security benefits, in satisfying not only secured, priority and administrative claims but also the unsecured claims, is without merit. Therefore, the Trustee's objection to the Amended Plan is denied, and said Amended Plan shall be returned to the Court's Confirmation Calendar to be held on September 12, 2006, at 2:00 p.m. in Binghamton, New York.

IT IS SO ORDERED.

Dated at Utica, New York

this lst day of September 2006

/s/    Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge